10-2929.121-RSK                                            May 2, 2012

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

RBS CITIZENS, N.A.                    )
                                      )
                Plaintiff,            )
                                      )
        v.                            )       No. 10 C 2929
                                      )
BENTLEY MOTORS, INC., et al.,         )
                                      )
                Defendants.           )

### MEMORANDUM OPINION

Before the court is counter-defendant Bentley Motors, Inc.'s ("BMI") motion to dismiss Count IV of counter-plaintiff Import Acquisition Motors, LLC's ("Import") Second Amended Counterclaim. For the reasons explained below, we grant BMI's motion.

### BACKGROUND

Counter-defendant Downers Motors, Inc. ("Downers") is a former franchised dealer of Bentley brand motor vehicles and products. (Second Am. Counterclaim ¶¶ 4, 10.) It owned and operated two Bentley dealerships: one on North Rush Street in downtown Chicago, and the other in Downers Grove, Illinois. (Id. at ¶ 4.) In early 2009, Downers was having financial difficulties and was delinquent in paying its obligations to BMI and RBS Citizens, N.A. ("RBS"), which had loaned money to Downers to purchase its vehicle and parts inventory. (Id. at ¶¶ 10, 14.) At that time, Downers began negotiating the sale of certain of its assets to I-Hopp Motor Cars,

- 2 -

LLC ("I-Hopp"). (Id. at ¶ 11.) On March 18, 2009, Downers and I-Hopp entered into an asset purchase agreement and submitted the agreement to Bentley for approval. (Id. at ¶¶ 12-13.) Import alleges that Bentley and RBS were concerned that Downers would go out of business before the asset sale closed. (Id. at ¶¶ 13-14.) In that event, BMI's image would be tarnished and it would lose access (at least temporarily) to an important market for its products. (Id. at ¶¶ 13, 60-68.) And RBS was concerned that Downers's failure would affect RBS's ability to collect the amounts that Downers owed under the parties' inventory-financing agreement. (Id. at ¶¶ 14, 37.) So, BMI and RBS "encouraged" the principals of I-Hopp to form an entity (i.e., Import) to finance and manage Downers's Bentley dealerships before the asset sale closed. (Id. at ¶ 15.) After Import was formed, it orally agreed with Bentley and RBS to enter into a Management Agreement with Downers in exchange for: (1) BMI's agreement to pay Import "all financial incentives, dealer preparation reimbursements, and warranty reimbursements" (the "Incentive and Warranty Funds") earned by Import during the Management Agreement's term; and (2) RBS's agreement to waive "any claims of right to those funds." (Id. at ¶ 16.) Import and Downers executed the Management Agreement on March 25, 2009, and thereafter Import managed the dealerships. (Id. at ¶ 17; see also Management Agmt., dated March 25, 2009, attached as Ex. A to Second Am. Counterclaim.) Pursuant to the

- 3 -

Management Agreement, Import agreed to pay the dealerships'
expenses during the agreement's term and it was entitled to retain
any income left after those expenses were paid. (See Management
Agreement ¶ 9.) Those profits constituted "full and complete
compensation for all of the services to be preformed by [Import] .
. . ." (Management Agmt. ¶ 9.) Import expected to receive the
Incentive and Warranty Funds in the ordinary course of operating
the dealerships, and it received assurances from BMI and RBS that
they would honor their agreement that Import would receive those
funds. (Second Am. Counterclaim ¶ 18-20.)

The Management Agreement was in effect for approximately five
months. (Id. at ¶ 17 (alleging that the Management Agreement was
terminated on August 14, 2009).)[1] During that time period Import
sold Bentley brand vehicles and parts at prices that were
profitable only if the promised Incentive and Warranty Funds were
taken into account. (Id. at ¶ 21.) For each Bentley brand vehicle
and part that Import sold, it paid RBS an agreed amount to release
RBS's lien. (Id. at ¶ 25.) "Often, Import paid RBS an amount that
was more than the retail sale price of a vehicle, in reliance on
receiving the incentive due from Bentley from the sale of the
vehicle." (Id.) Both BMI and RBS allegedly knew that Import was

---

[1] Although not alleged in Import's counterclaim, we understand from other
pleadings that Import did not ultimately acquire the dealerships. Instead,
Downers sold them to counter-defendants Gold Coast Exotic Imports, LLC ("GCEI")
and Joseph Perillo, Sr. (See GCEI's Counterclaim and Joseph Perillo's Compl. for
Decl. J. ¶ 14.)

- 4 -

making sales, and paying to release RBS's liens, in reliance on their promises that Import would receive the Incentive and Warranty Funds. (Id. at ¶¶ 21, 25-27.) Although Import performed all of its obligations, Bentley has refused to pay Import and is holding the funds in an "open account" in the dealerships' names. (Id. at ¶ 33.) Import estimates that the total Incentive and Warranty Funds that it earned during the Management Agreement's term exceed $700,000. (Id. at ¶ 30.)

This case began in state court when RBS filed a complaint against BMI and Downers seeking a declaration that RBS was entitled to the open-account funds as Downers's secured creditor. BMI then filed a counterclaim for interpleader alleging that it had received competing claims to those funds. (See BMI's First Am. Counterclaim for Interpleader ¶ 31 (disclaiming any interest in the funds held in the open account).) BMI's counterclaim names the following defendants/claimants: RBS, Import, Downers, I-Hopp, GCEI, Gold Coast Motor Cars, Inc. ("GCMC") (identified as the dealerships' manager, presumably after GCEI and Perillo acquired Downers), and the Internal Revenue Service ("IRS"), which has asserted a tax lien against the funds. (See id. at ¶¶ 3-9.) After the IRS removed the case to this court, Import filed its counterclaim asserting unjust enrichment against RBS (Count I), breach of oral contract against BMI (Count II), promissory estoppel against BMI (Count III, pled in the alternative to Count II),

- 5 -

unjust enrichment against BMI (Count IV, also pled in the alternative to Count II), and declaratory judgment against all other claimants besides I-Hopp (Count V). BMI has moved to dismiss Count IV only.[2]

## A.  Legal Standard

The purpose of a 12(b)(6) motion to dismiss is to test the sufficiency of the complaint, not to resolve the case on the merits. 5B Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 1356, at 354 (3d ed. 2004). To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009) (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570, 556 (2007)). When evaluating a motion to dismiss a complaint, the court must accept as true all factual allegations in the complaint. <u>Iqbal</u>, 129 S. Ct. at 1949. However, we need not accept as true its legal conclusions; "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 555).

---

[2]/  RBS filed its own motion to dismiss, but settled its dispute with Import while that motion was pending.

- 6 -

**B.  Unjust Enrichment**

"To state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience."  HPI Health Care Services, Inc. v. Mt. Vernon Hosp., Inc., 545 N.E.2d 672, 679 (Ill. 1989).   In cases where the plaintiff seeks to recover a benefit that the defendant received from a third party, the plaintiff must also show that: "(1) the benefit should have been given to the plaintiff, but the third party mistakenly gave it to the defendant instead, (2) the defendant procured the benefit from the third party through some type of wrongful conduct, or (3) the plaintiff for some other reason had a better claim to the benefit than the defendant."  Id. at 679; see also Independent Trust Corp. v. Fidelity Nat. Title Ins. Co. of New York, 577 F.Supp.2d 1023, 1047-48, n.27 (N.D. Ill. 2008) (observing that a plaintiff must make an "additional showing" that its claim fits into one of the three categories identified in HPI only "[w]hen someone other than the plaintiff transfers the benefit to the defendant").  BMI argues that Import must make the "additional showing" that HPI requires because Import's performance benefitted Downers directly — it managed Downers's dealerships for five months — and only indirectly benefitted BMI.  But Import does not allege that BMI received a

- 7 -

benefit from a third party (e.g., Downers) that rightfully belonged to Import.  Instead, it alleges that it conferred benefits on both BMI and Downers flowing from the continued operation of the dealerships when it appeared that Downers was going fail before the asset-purchase transaction closed.  See Midcoast Aviation, Inc. v. General Elec. Credit Corp., 907 F.2d 732, 738 n.3 (7th Cir. 1990) (distinguishing HPI on the grounds that that case involved "the transfer of money by a third party to the defendant, not the rendition of services by a plaintiff *that benefits a third party and the defendant*") (emphasis added).  We conclude that Import may state a claim for unjust enrichment without pleading the additional requirements described in HPI.

However, a party who performs services under a contract cannot sue third parties for unjust enrichment merely because they benefit from that performance:

> [I]f you do work pursuant to a contract with X, you don't expect that Y, a nonparty, will pay you if X defaults, merely because Y was benefitted by your work; and expectation of payment is an essential element of a claim for restitution.

Goldstick v. ICM Realty, 788 F.2d 456, 467 (7th Cir. 1986); see also Midcoast, 907 F.2d at 739 (collecting cases).  Import argues that its claim fits within an exception to this general rule that our Court of Appeals recognized in Midcoast.  One of the defendants in that case, American Aviation Industries, Inc. ("AAI"), had the idea to refurbish old jet aircraft for resale, and it obtained

- 8 -

funding for the project from the other defendant, General Electric

Credit Corporation ("GECC"). Midcoast, 907 F.2d at 734-35. AAI

leased an aircraft, the "demonstrator," from GECC and executed an

agreement with GECC to modernize the plane. Id. AAI, in turn,

contracted with the plaintiff, Midcoast Aviation, Inc.

("Midcoast"), to perform the actual work. Id. Midcoast's

agreement with AAI provided that Midcoast would recoup its expenses

through work done in the future if the parties reached a long-term

agreement, but it would demand payment immediately if the parties

were unable to work out such a deal. Id. Midcoast knew that AAI

was on "shaky financial ground," so before entering into the

agreement with AAI it sought and obtained assurances from GECC that

it would continue to finance the project. Id. at 735-36. Working

on a tight timetable imposed by AAI and GECC, Midcoast completed

the project on time. Id. at 736. However, its negotiations for a

long-term deal with AAI faltered, and as agreed Midcoast submitted

a bill for its services to AAI. Id. At that time, AAI was

operating under a financing agreement that gave GECC control over

AAI's payments to creditors. Id. Exercising that control, GECC

directed AAI not to pay Midcoast: "[s]ince Midcoast and AAI had

failed to reach a long-term production facility agreement, GECC

considered Midcoast old hat." Id. Midcoast successfully sued GECC

on a quasi-contract theory. Id. On appeal of that judgment, GECC

argued that Midcoast's claim ran afoul of the rule that a third

party is not unjustly enriched when it benefits from a contract

- 9 -

between other parties.  The <u>Midcoast</u> Court concluded that this rule
did not bar Midcoast's claim because a reasonable jury could have
found that GECC had not "merely" benefitted from Midcoast's work.
It had "enticed Midcoast to undertake the work in the first place
and then refused to see Midcoast paid."  <u>Id.</u> at 739.  Midcoast
reasonably expected that GECC would pay for its services given
GECC's control over AAI, its assurances to Midcoast, and the
concrete benefits that it had received from those services.  <u>Id.</u> at
739-40.  In sum, "a reasonable jury pondering the law of quasi-
contract could find the facts indicative of what the words 'unjust'
and 'inequitable' stand for."  <u>Id.</u> at 738.

BMI allegedly "encouraged" Import to enter into the Management
Agreement with Downers.  So, arguably, it did more than "merely"
benefit from Import's performance under the Management Agreement.
But the Management Agreement expressly provided that Import's "full
and complete" compensation for managing the dealerships would be
the money that the dealerships generated while under Import's
control.  This is the agreement that BMI allegedly encouraged and
approved.  In its claim for unjust enrichment, however, Import
seeks to recover speculative benefits that the Management Agreement
allegedly conferred on BMI.  (<u>See</u> Second Am. Counterclaim ¶ 74
(seeking more than $5 million for enabling BMI to avoid lost sales
and damage to its reputation).)  We do not read <u>Midcoast</u> to permit
a plaintiff to obtain relief from a third party that is contrary to
the contract the defendant allegedly enticed the plaintiff to

- 10 -

execute. <u>Cf.</u> <u>Stewart v. McIntosh</u>, 44 N.E.2d 451, 453 (Ill. Ct. App. 1942) ("The law will not impose an implied obligation on any person contrary to an express undertaking . . . .") (internal citations omitted). Even if Import's unjust-enrichment claim sought only the "income" that it was due under the Management Agreement, we would still grant BMI's motion. We accept as true for purposes of BMI's motion that it agreed to pay Import the Incentive and Warranty Funds. But it is also true that BMI has received multiple competing claims to those funds, and the law permits it to withhold payment while a court decides who is entitled to the money. In short, BMI is not refusing to pay Import on grounds that a reasonable person would call unjust.

In its sur-reply, Import argues that our Court of Appeals' decision <u>Goldstick</u> supports its claim. (Import's Sur-Reply at 6-7.) In <u>Goldstick</u>, the defendant ICM Realty purchased an apartment complex and leased it to an individual named John Kusmiersky, a "work-out specialist" that ICM brought in to salvage its investment in the property. <u>Goldstick</u>, 788 F.2d at 458. ICM gave Kusmiersky money to operate the property and to pay past-due real estate taxes. Kusmiersky, in turn, retained the plaintiffs on a contingent-fee basis to reduce the taxes. <u>Id.</u> The plaintiffs, both lawyers, succeeded in significantly reducing the taxes, but ICM did not pay their bill. <u>Id.</u> at 458-59. ICM later entered into negotiations with a prospective purchaser who refused to commit to

- 11 -

a deal unless ICM paid the remaining taxes and the plaintiffs released their claim for unpaid fees. Id. at 459. The plaintiffs executed the release, but parties later disputed its terms: ICM argued that the parties had agreed that the plaintiffs would only be paid out of the property's profits; the plaintiffs argued that payment was unconditional. Id. The property did not make a profit, and the plaintiffs sued ICM when it refused to pay their fee. Id. The district court granted the defendants summary judgment on the plaintiffs' claims for breach of contract, promissory estoppel, and restitution, and our Court of Appeals reversed. The Court's discussion focused on two points in time: (1) Kusmiersky's original contingent-fee agreement with the plaintiffs; and (2) the subsequent negotiations to release the plaintiffs' claim. With respect to the parties' original agreement, the Court concluded that there was a material factual dispute whether Kusmiersky was acting as ICM's agent. Id. at 460-61. So, by authorization or by ratification, a jury could find an express contract between ICM and the plaintiffs. Id. However, the plaintiffs could not assert a claim for restitution: "[i]f . . . the contract was just between the plaintiffs and Kusmiersky, the plaintiffs cannot bring ICM in through the back door by pointing out that their contractual performance conferred benefits on ICM." Id. at 467. With respect to the release, the Court concluded that the terms of the parties' alleged agreement were too vague to

- 12 -

support a claim for breach of contract.  Id. at 461-62.  But the
court ruled that the plaintiffs were entitled to proceed on their
claims for promissory estoppel and restitution.  Id. at 462-68.
Even a vague promise could support a claim for estoppel, (id. at
462-63), and the plaintiffs reasonably expected some compensation
from ICM for executing the release.  Id. at 468.

Import seizes on this last conclusion and argues that it
supports its claim for unjust enrichment. (See Sur-Reply at  7.)
We  disagree.   It  would  be  unreasonable  to  suppose  that  the
Goldstick plaintiffs had released their claim for unpaid fees
without any expectation of payment. See Goldstick, 788 F.2d at 467
("[W]hen a businessman confers benefits in circumstances where
payment is normal and any inference of altruism can be rejected, a
claim for restitution, or 'quasi-contract,' arises.").  But ICM
also benefitted when the plaintiffs successfully lowered the
property's past-due taxes.  This benefit was "real," but unlike the
release, it was "not the kind of benefit for which compensation can
be obtained under the law of restitution."  Id. at 468 (citing the
general rule, discussed earlier in this opinion, that third parties
who benefit from a plaintiff's contract with another party are not
liable for unjust enrichment).  Just so here.  BMI benefitted from
Import's performance under the Management Agreement, but that
benefit did not create a reasonable expectation of payment from BMI

- 13 -

given the Management Agreement's terms.  Count IV against BMI is dismissed.

## CONCLUSION

BMI's motion to dismiss [123] is granted.  Count IV against BMI is dismissed with prejudice.

DATE:    May 2, 2012

ENTER:   _____

John F. Grady, United States District Judge